## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FRANK VISSER, on Behalf of Himself and All Others Similarly Situated,<br><br>                  Plaintiff,<br><br>     v.<br><br>ENERGY RECOVERY, INC. and JOSHUA BALLARD, JOEL GAY, CHRIS M. GANNON, AND ROBERT YU LANG MAO,<br><br>               Defendants. | Case No.<br><br>**<u>CLASS ACTION</u>**<br><br>**<u>COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS</u>**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Frank Visser ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his undersigned counsel, hereby brings this Class Action Complaint for Violation of Federal Securities Law ("Complaint") against (i) Energy Recovery, Inc. ("Company" or "Energy Recovery"); (ii) Joshua Ballard, the Company's Chief Financial Officer ("CFO"); (iii) Joel Gay, the Company's former Chief Executive Officer ("CEO"); (iv) Chris M. Gannon, the Company's former President and CEO; and (v) Robert Yu Lang Mao, the Company's current CEO (Defendants Ballard, Gay, Gannon, and Mao are collectively referred to as "Individual Defendants", and together with the Company as "Defendants") based upon, *inter alia*, the investigation conducted by and under the supervision of Plaintiff's counsel, which included a review of the Company's public documents, conference calls, and announcements, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding the Company, analysts' reports and advisories about the Company and readily obtainable information.  Plaintiff's counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to, or are exclusively within the custody or control of, the Company and the Individual Defendants. Plaintiff

believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired common shares of Energy Recovery stock between August 2, 2017 and June 29, 2020, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violation of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Energy Recovery is a Delaware corporation headquartered in San Leandro, California. The Company develops and manufactures technologies utilized in the water desalination industry.  In December 2014, Energy Recovery announced the launch of VorTeq hydraulic pumping system, which was designed to increase runtime and reduce maintenance costs associated with pump failures.  The VorTeq technology is intended to reroute the abrasive frac fluid away from existing hydraulic fracturing pumps, and thereby, reduce frequent failures in the high-pressure hydraulic fracturing.

3.      On October 19, 2015, the Company announced that it has signed a fifteen-year deal with Schlumberger Technology Corp. ("Schlumberger"), which gave Schlumberger the exclusive right to the use of the Company's VorTeq technology (the "Schlumberger Licensing Agreement").  Under the terms of the Schlumberger Licensing Agreement, Schlumberger paid $75 million exclusivity fee and was to pay an additional $50 million milestone payments in 2016. The terms also dictated that Schlumberger would pay continuing annual royalties for the duration of the license agreement, subject to the satisfaction of certain key performance indicators.

4.      At all relevant times, the Schlumberger Licensing Agreement represented one of two critical business relationships, on which the Company solely depended in achieving the

commercialization of its leading VorTeq technology and securing a stream of revenue. In fact, license revenue from VorTeq was projected to reach $12 to $14 million in 2020, and thus, represented a significant portion of the Company's total revenues.

5.     Throughout the Class Period, Defendants made materially false and misleading statements, and failed to disclose material adverse facts about the Company's business, operations, and financial health. Specifically, Defendants made false and/or misleading statements and failed to disclose to investors that: (i) the Company and Schlumberger had different strategic perspectives regarding commercialization of VorTeq; (ii) which created substantial risk of early termination of the Company's exclusive licensing agreement with Schlumberger; (iii) accordingly, the revenue guidance and expectations of future license revenue was false and lacked reasonable basis; and (iv) as a result, Defendants' public statements were materially false and misleading at all relevant times or lacked a reasonable basis and omitted material facts.

6.     On June 29, 2020 — not even five years into the Schlumberger License Agreement — the Company issued a press release, announcing the termination of the licensing agreement with Schlumberger, citing to "different strategic perspectives as to the path to VorTeq commercialization." The Company further announced that following the termination, "no further payments will be made by either party" and that "Energy Recovery will now be fully responsible for commercialization of the VorTeq technology globally."

7.     This news caused a precipitous decline in the price of Energy Recovery shares, which fell 15.8%, to close at $7.59 on June 30, 2020, on unusually high trading volume. Several securities analysts downgraded Energy Recovery's rating and significantly lowered the Company's price target. As one analyst commented, "[the Company] should have been able to perceive in advance and then explicitly warn about the significant, and likely rising, odds of this outcome."

8.     As a result of Energy Recovery's wrongful acts and omissions, and the precipitous

decline in the market value of its common shares, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under Section 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

11.      Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Energy Recovery's common stock trades on the NASDAQ Stock Market ("NASDAQ").   Accordingly, there are presumably hundreds, if not thousands, of investors in Energy Recovery's common stock located within the U.S., some of whom undoubtedly reside in this judicial district.

12.      In connection with the acts alleged in this Complaint, Energy Recovery, directly or indirectly, used the instrumentalities of interstate commerce, including interstate wires, U.S. Postal Service mail, wireless spectrum, and the national securities exchange.

## PARTIES

13.      Plaintiff is a resident of Malden, Netherlands.   As set forth in the attached Certification, incorporated by reference herein, Plaintiff acquired Energy Recovery shares during the Class Period and was damaged by the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

14.      Defendant Energy Recovery is a Delaware company with a principal place of business at 1717 Doolittle Dr., San Leandro, California, United States.   Energy Recovery shares trade on the NASDAQ under the ticker symbol "ERII."   Defendant Energy Recovery develops and manufactures

energy recovery devices for oil and gas, chemical and water industries.

15. Defendant Joshua Ballard ("Defendant Ballard"), served as the Company's CFO since August 13, 2018.

16. Defendant Joel Gay ("Defendant Gay"), served as the Company's CEO from April 24, 2015 to February 2018 and CFO from June 27, 2014 and held several positions at the firm since January 2012.

17. Defendant Chris M. Gannon ("Defendant Gannon") served as the Company's interim President and CEO from February 25, 2018 and appointed President and CEO on May 3, 2018 until November 1, 2019. Prior to this he was the CFO from June 1, 2015.

18. Defendant Robert Yu Lang Mao ("Defendant Mao") served as the Company's interim President and CEO since November 1, 2019 and appointed President and CEO on May 5, 2020.

19. The Individual Defendants possessed the authority to control the contents of statements made by Energy Recovery in the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.,* the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Due to their position with the Company at various points, and their access to Energy Recovery's material information that was unavailable to the public, the Individual Defendants knew that the adverse facts described herein were not disclosed to and were being concealed from investors. Defendants are therefore liable for the false statements and omissions alleged herein.

## SUBSTANTIVE ALLEGATIONS

### Background

20.     Founded in 1992, Energy Recovery manufactures and develops technological solutions for industrial fluid flow markets across the world.  It designs novel technologies aimed at reducing waste, improving operational efficiencies and lowering production costs of clean water, oil and gas.  The Company's leading solution is the VorTeq hydraulic pumping system, which was launched in December 2014.  VorTeq was the first hydraulic fracturing manifold built to isolate hydraulic fracturing pumps from abrasive proppants that cause pump failure.  By re-routing abrasive proppants away from high-pressure pumps, the use of VorTeq technology leads to increased runtime and reduction in maintenance costs associated with pump failures.

21.     The Company's ability to commercialize VorTeq was, at all relevant times, critically important to its operations and financial performance.  The market opportunity for VorTeq worldwide is about $1.3 billion, with $849 million within the United States.  Energy Recovery projected that VorTeq annual license revenues would reach approximately $12 to $14 million during the first year of its commercialization and would thereby significantly contribute to the Company's total revenues.  Furthermore, VorTeq gives Energy Recovery a competitive advantage over existing missile manifold technology used by the Company's competitors.  By the Company's own admission, innovation and product development efforts are the Company's greatest strength.  Accordingly, since its launch in December 2014, the Company has made substantial Research and Development investments focused solely on commercializing its VorTeq technology.  Since its launch, the Company's presentations and public announcements uniformly highlight Energy Recovery's revolutionary technology and special emphasis on VorTeq's introduction into the general market.

22.     On October 19, 2015, the Company announced a 15-year exclusive licensing agreement with Schlumberger — a Texas based oilfield services company — for the exclusive,

worldwide right to use VorTeq for hydraulic fracturing onshore operations.  According to the Schlumberger Licensing Agreement, Schlumberger would pay $75 million exclusivity fee as well as two separate $25 million milestone payments subject to the Company satisfying certain key performance indicators expected to occur in 2016.  The VorTeq Agreement also provided for continuing annual royalties for the duration of the license agreement subject to the Company satisfying certain key performance indicators.  The market's reaction to this news was extremely positive as the Company share price more than doubled on this day.

23.     Since the entering into the Schlumberger Licensing Agreement, the Company executives regularly disseminated misleading news to the investing public, assuring investors of the Company's collaborative and reliable business relationship with its critical business partner, Schlumberger.  The Company executives repeatedly highlighted the unwavering support the Company received from Schlumberger during the VorTeq testing phases and its significant contribution to the successful commercialization.  At all relevant times, the Company executives denied that any changes occurred with respect to the timing or the path to VorTeq's commercialization.  These false assurances gave the investing public no reason to suspect that the Company and Schlumberger had diverging strategic perspectives regarding the commercialization of VorTeq, let alone that the Company was planning to terminate the Schlumberger Licensing Agreement – a fact known to the Company executives, yet undisclosed to Energy Recovery's investors.

### Materially False And Misleading Statements
### Issued During The Class Period

24.     The Class Period begins on August 2, 2017.  On that day, Energy Recovery issued a press release announcing its financial results for the second quarter of 2017 as well as the year-to-date results for the first six months of 2017.  In the press release, Defendant Gay highlighted the Company's efforts in achieving commercialization of VorTeq, stating as follows:

In addition to further anchoring what we expect to be another impressive if not record-setting fiscal performance, **we also made significant progress along the critical path for the eventual commercialization of the VorTeq** and MTeq technologies. Specific to the VorTeq, in the quarter, we concluded the most comprehensive and rigorous design process in the company's history to render the second generation prototype system.

25.     During the Earnings Calls held on the next day to discuss the Company's quarterly results, Defendant Gannon emphasized the Company's investment in commercialization of VorTeq, stating that "[t]he increase [of 9.7%] in operating expenses was driven by our continued investment in our emerging Oil & Gas Segment, particularly related to our VorTeq and MTeq commercialization efforts."

26.     On November 1, 2017, the Company issued a press release announcing its financial results for the third quarter of 2017 as well as the year-to-date results for the first nine months of 2017.  In the press release, Defendant Gay touted the results of private testing of the second generation VorTeq system, stating in relevant part:

In addition to posting yet again record-breaking financial results in the quarter, the Company concluded full-scale, private testing of the second generation VorTeq system at an undisclosed facility, and in doing so, executed the most successful examination of the technology to date.  While we have in the past refrained from disclosing discreet testing results, **due to the swelling anticipation as to the outcome of this process and its materiality to the Company, we feel our shareholders deserve an unfiltered account of what are indisputable proof points as to the product's commercial potential.**

27.     On November 3, 2017, the Company filed its quarterly report on SEC Form 10-Q for the third quarter of 2017.  In it, the Company reiterated that it was "actively working towards commercialization of the VorTeq including conducting extensive field trials."

28.     During the Earnings Call held the previous day to discuss the third quarter financial results, Defendant Gay highlighted Energy Recovery's and Schlumberger's common interest and equal responsibility in commercializing VorTeq technology, stating as follows:

Clearly both parties have very compelling economic interests in seeing this product to commercialization. And as I've stated in the past, they have been massively supportive

of this product and certainly of our company. And I'm of the opinion that our engineers are some of the finest in the world, and certainly Schlumberger's engineers are some of the finest in the world, and the combination of those two talent pools will certainly yield a solution to how we can best simulate a well and get through a 5-stage frac.

29.     Defendant Gay then assured investors that they will receive full disclosure and the "best updates" as facts regarding commercialization of VorTeq become available, remarking as follows:

> We don't provide guidance on our R&D efforts with conservatism. We don't sandbag. Sandbagging is a lasting vestige of the corporate scoundrel. That's not what we do. **We provide the best updates based on the facts and circumstances as they stand. Our objective is to get this thing done by the end of the year,** but if we don't, we would be disappointed, sure. But ERI will still be here on January 1, 2018, and this product will be commercialized. All right? This is the NFA management team, not fooling around. There's no quitting us and we're going to get it across finish line.

30.     On December 18, 2017, the Company hosted an investor Update Call.  During the call, Defendant Gay answered a question from B.Riley/FBR analyst, Thomas Curran, regarding Energy Recovery's business relationship with Schlumberger.  Defendant Gay assured investors of Schlumberger's support, stating as follows:

> Yes. As we have in the past, we're going to refrain from speaking on behalf of the other product licensee. **What I can tell you, Tom, is that [Schlumberger] ha[s] been extremely supportive and creative, frankly**, in terms of getting the testing facility to a state where we could actually attempt -- successfully attempt the milestone, and I'm talking about the ability to get to 9,000 psi or what's required in the contract.
>
> From our perspective, clearly, we're pretty excited, pretty amped about the fact that we were able to hit the KPIs as it relates to rate and pressure. **And in terms of Schlumberger, you'd have to pull them directly. But I can only speak to the level of support that they've demonstrated throughout this process.**

31.     On February 24, 2018 — after not even three years of service — Defendant Gay abruptly resigned, citing to "personal family matters."  Following Defendant's Gay resignation, the Company's then CFO, Defendant Gannon, was appointed to the role of interim President and CEO.

32.     On March 8, 2018, the Company filed its annual report on SEC Form 10-K for the fiscal year ended December 31, 2017 and the fourth quarter of 2017.  In it, the Company confirmed

it was "currently working with [Schlumberger] to commercialize the VorTeq technology." During an Earnings Call held on the same day to discuss the Company's financial results, Defendant Gannon commented on Schlumberger's "commitment or adherence to the licensing agreement," as follows:

> Well, I'm not going to speak on behalf of our licensing partner but what I can tell you is that it's business as usual. They were very enthusiastic and we are very focused along with them on commercializing VorTeq.

33.     On May 3, 2018, the Company filed its quarterly report on a SEC Form 10-Q for the period ended March 31, 2018. During an Earnings Call held on the same day to discuss the Company's financial results, B.Riley/FBR analyst, Thomas Curran, asked whether the testing process for purposes of milestone one of the Schlumberger's Agreement will include the "another Schlumberger frac crew and [a] return to the same location." Defendant Gannon confirmed that testing would "be going back to the same testing facility."

34.     Energy Recovery continued to assure investors of its continued collaboration with Schlumberger well into 2019. For example, on March 7, 2019, the Company issued a press release announcing the financial results for the fiscal year and fourth quarter ended on December 31, 2018. In the press release, Defendant Gannon commented on the Company's progress in commercializing VorTeq: ***"[W]e are collaborating closely with our partners*** as we move into the next phase of development towards commercialization." During an Earnings Call held on the same day in connection with the Company's filing of its annual report, B.Riley/FBR analyst, Thomas Curran, asked whether the collaboration referenced in the press release included working with the Company's license partner, Schlumberger: "[C]ould you just confirm that by saying in the press release that you're collaborating closely with your partners, by partners you mean both of the two licensees that have been involved contractually from the beginning, Schlumberger and Liberty?"

35.     In response, Defendant Gannon confirmed Energy Recovery was collaborating with Schlumberger, stating in relevant part: **"*Yes. So to your first question on who we're working with, we are, in fact, working with our product licensee and our product partner very closely.*"**

36.     On May 2, 2019, the Company issued a press release announcing its financial results for the first quarter ended on March 31, 2019.  In the press release, Defendant Gannon touted the Company's progress toward commercializing VorTeq, stating in relevant part:

> In our Oil & Gas business, we remain solely focused on commercializing the VorTeq system. We have now put in place the engineering and operational resources required to test at scale at our facility. Consistent testing and runtime have led to concrete progress on the system level design enhancements identified last year as precursors to Milestone One and commercialization. I am pleased by our progress and continue to believe that we will meet our Milestone One requirements this year.

37.     During an Earnings Call held on the same day to discuss the Company's financial results, Defendant Gannon reiterated the Company's collaboration with its partners, stating as follows:

> Well, yes, I mean, we are focused naturally on commercializing the VorTeq technology for both our product licensee and our product partner. They are the most important customers to us on this product. And so we're doing everything that we can at our testing facility to meet their needs and move the technology forward as rapidly as possible, which will ultimately benefit them.

38.     On November 1, 2019, the Company filed its quarterly report on SEC Form 10-Q. During an Earnings Call held on the same day to discuss the financial results, Defendant Gannon confirmed that there were "no changes" with respect to commercialization of VorTeq with Schlumberger's support.   More specifically, when asked by B.Riley/FBR analyst, Ryan Pfingst, whether there have "been any new appointments to Schlumberger's VorTeq team or any changes to their approach to – or ***communications around the timing of M1 or the path of commercialization,***" Defendant Gannon responded: **"*The simple answer is no.  There's been no changes.*"**

39.     On the same day — after one and a half years on the job — Defendant Gannon abruptly resigned, citing to "personal reason."   On his resignation, the Company appointed Defendant

Mao to the role of interim President and CEO.

40.     On March 5, 2020 — less than three months before the termination of the Schlumberger Licensing Agreement — the Company published a press release announcing its financial results for the fourth quarter and fiscal year ended December 31, 2019.  In the press release, Defendant Mao commented on the Company's near- and long-term prospects, stating as follows:

> While the Company's near-term priorities remain water business growth and VorTeq commercialization, we also made strides in 2019 implementing a structure that will enable a disciplined approach to longer-term growth. I firmly believe Energy Recovery enters this new decade with the right elements in place for continued success.

41.     During an Earnings Call held on the same day, Defendant Ballard informed investors of the Company's expectation to generate license revenue of $12 million to $14 million in 2020 and a quarterly revenue in the range of $2 million to $3 million in the first half of the year and $3.5 million to $4.5 million in the second half.

42.     During the same Earnings Call, Defendant Mao commented on the Company's continued collaboration with Schlumberger through the year 2020.  The following exchange took place between Defendant Mao and B.Riley/FBR Analysts, Thomas Curran:

> [Thomas Curran:] I see, so you expect over the course of this year to both move forward and conduct testing with Liberty at a live frac job site with one of the Liberty's actual customers as well as resuming and completing ***M1 with Schlumberger, you expect to move forward with both with year?***
>
> [Defendant Mao:] That's correct, yes.

43.     When asked about the testing progress with regards to the Company's ability to meet the first milestone in the Schlumberger's licensing agreement, Defendant Mao, confirmed the Company's expectation to reach the Schlumberger milestone in 2020.  While giving these assurances, at no point did any Individual Defendants allude to the fact that the Company and Schlumberger held diverging views regarding the strategy to commercialize the VorTeq technology, nor that the Company of Schlumberger had plans to terminate the Schlumberger Licensing Agreement.

44.     On May 1, 2020, the Company filed its quarterly report on SEC Form 10-Q for the quarterly period ended March 31, 2020.  The quarterly report — published only two months before the Schlumberger Licensing Agreement was terminated — made no mention of the relationship between the Company and Schlumberger, their strategic views regarding commercialization, or any plans to terminate the Schlumberger Licensing Agreement.  Instead, during the Earnings Call held on April 30, 2020, to discuss the financial results, Defendant Mao again assured investors of the Company's continued collaboration with Schlumberger and their common future plans to reach the first milestone under the Schlumberger licensing agreement.  To that effect, Defendant Mao stated:

> First of all, the M1 [meaning milestone one], we can do M1 on our own and document M1, present it to Schlum. And also, we can request that Schlum would do M1 with us after we documented our own M1 that is to do at the Schlum's facilities. And this is not a live frac. So, therefore, it does not contribute to the oversupply of oil.
>
> \*        \*        \*
>
> So, therefore, Pavel, we will do M1 first ourselves, just to be sure that we pass all the requirements. And then, in fact, per contract, we will request to do M1 with Schlum, although the completion of M1 is not dependent on Schlum doing M1. But we need to document that we have done the M1.

45.     Defendant Mao further added, "I expect that we will actually go into a comprehensive discussion review our respective operational commercialization plans. So M1 will be viewed in that overall context. But the first thing, we have to demonstrate we have done [the M1]."

46.     During the same call, Defendant Ballard reiterated the expectation of reaching $12 million to $14 million in license revenue for the year 2020, and a quarterly license revenue in the second quarter of $3.5 million.

47.     The Company and/or the Individual Defendants gave no indication that the partnership with Schlumberger was at risk due to "different strategic perspectives" or that the Schlumberger License Agreement was at risk of early termination.  Neither did Defendants changed their license revenue expectations in light of the imminent termination of the Schlumberger Licensing

Agreement. Instead, the Individual Defendants continued to emphasize the collaboration between Schlumberger and Energy Recovery, giving investors false expectations and assurances of VorTeq's future commercialization and cooperation between Energy Recovery and Schlumberger as well as the license revenue to be generated as a result of their collaboration.

48.     The above statements identified in ¶¶ 23-47 were materially false and/or misleading and failed to disclose to investors that: (i) the Company and Schlumberger had different strategic perspectives regarding commercialization of VorTeq (ii) which created substantial risk of early termination of the Company's exclusive licensing agreement with Schlumberger; (iii) accordingly, the guidance and expectations of future license revenue was false and lacked reasonable basis; and (iv) as a result, Defendants' public statements were materially false and misleading at all relevant times or lacked a reasonable basis and omitted material facts.

## The Truth Begins To Emerge

49.     On June 29, 2020 — following Company's assurances of its continued collaboration with Schlumberger and VorTeq's path to commercialization — Energy Recovery announced the termination of the 15-year Schlumberger Agreement, which the parties had signed not even four years earlier, in October 2015.

50.     On this news, the price of the Company shares declined 15.8%, to close at $7.59, on June 30, 2020, on unusually high trading volume.

51.     Energy Recovery's announcement received chilly reception from analysts and investors alike who were shocked by the sudden exit from the Schlumberger Licensing Agreement. While several securities analysts downgraded Energy Recovery's ratings and lowered the Company's price target, others expressed skepticism over Energy Recovery's ability to commercialize VorTeq and earn any revenue prior to 2020. B.Riley/FBR analyst, Thomas Curran, pointed out to the Company's lack of disclosures around the exit form Schlumberger Licensing Agreement, stating pointedly: ***"ERII***

*should have been able to perceive in advance and then explicitly warn about the significant,*

*and likely rising, odds of this outcome."*

52.     The analyst also exclaimed that "when it comes to the ongoing effort to advance the

VorTeq into commercialization, ERII has lost the technology's key guiding relationship since late 2015

and most likely source of pre-2020 revenue. . . ."

## CLASS ACTION ALLEGATIONS

53.     Plaintiff brings this action pursuant to Rules 23(a) and (b) of the Federal Rules of Civil

Procedure, on its own behalf and as representative of a Class, consisting of all those who purchased

or otherwise acquired Energy Recovery's shares during the Class Period ("Class"); and were damaged

upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants

and the officers and directors of the Company, at all relevant times, members of their immediate

families and their legal representatives, heirs, successors or assigns and any entity in which Defendants

have or had a controlling interest.

54.     The Class is so numerous and geographically dispersed that joinder of all members is

impracticable.  Throughout the Class Period, Energy Recovery shares were actively traded on the

NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can

be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or

thousands of members in the proposed Class.  Record owners and other members of the Class may

be readily identifiable from information and records in the possession of Defendants or its transfer

agent and may be notified of the pendency of this action by mail, using the form of notice similar to

that customarily used in securities class actions.

55.     Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff

and members of the Class sustained damages from the same wrongful conduct of Defendants. The

injuries and damages of each member of the Class were directly caused by Defendants' wrongful

conduct in violation of the laws described herein.

56.     Plaintiff will fairly and adequately protect and represent the interests of members of the Class. Plaintiff is an adequate representative of the Class and has no interest which is adverse to the interests of absent Class members.  Plaintiff has retained counsel competent and experienced in class action litigation, including class actions in the financial services industry.

57.     Common questions of law and fact exist as to all members of the Class, which predominate over questions affecting solely individual members of the Class. These common questions of law include, without limitation:

- whether statements made by Energy Recovery and the Individual Defendants to investors during the Class Period included misrepresentations of material facts about the relationship with Schlumberger, financial condition, operations and oversight of operations at Energy Recovery;

- whether Energy Recovery failed to indicate to its investors that the Company and Schlumberger are having strategic differences in respect of commercialization of VorTeq and thereby misled their investors;

- whether Energy Recovery and the Individual Defendants acted knowingly or recklessly in issuing false and misleading statements or omitting material information that would correct the misstatements;

- whether Energy Recovery's and the Individual Defendants' acts as alleged herein constituted violations of the federal securities laws;

- whether the prices of Energy Recovery shares during the Class Period were impacted by Company's and the Individual Defendants' conduct described herein;

- injury suffered by Plaintiff and Class members; and

- the appropriate measure of damages suffered by Plaintiff and Class members.

58.     A class action is superior to other methods for the fair and efficient adjudication of the controversy because joinder of all Class members is impracticable.  Treatment as a Class  will  permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously,  efficiently,  and  without  the  duplication  of  effort  and  expense  that  numerous individual actions would engender.

59.     Class treatment will also permit the adjudication of claims by many Class members who could not afford individually to litigate claims such as those asserted in this Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Energy Recovery and the Individual Defendants.

60.     Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## FRAUD ON THE MARKET DOCTRINE

61.     The market for Energy Recovery shares was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Energy Recovery's shares traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired the Company's shares relying upon the integrity of the market price of Energy Recovery shares and market information relating to Energy Recovery and have been damaged thereby.

62.     During the Class Period, the artificial inflation of Energy Recovery's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Energy Recovery's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Company's financial and its business, operations, and prospects, thus causing the price of the Company's shares to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the its shares. Defendants' materially false and/or misleading statements during the Class Period resulted in

17

Plaintiff and other members of the Class purchasing Energy Recovery's shares at such artificially inflated prices, and each of them has been damaged as a result.

63.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine as:

- Energy Recovery and the Individual Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- these misrepresentations and omissions were material to Plaintiff and the Class;

- Energy Recovery shares were traded on the NASDAQ and were covered by numerous analysts;

- Energy Recovery shares were liquid and traded with significant volume during the Class Period;

- the misrepresentations and omissions alleged herein would likely induce a reasonable investor to misjudge the value of the Energy Recovery shares; and

- Plaintiff and Class members purchased and/or sold Energy Recovery shares between the time Energy Recovery and the Individual Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

64.     As a result of the foregoing, the market for Energy Recovery shares promptly digested current information regarding Energy Recovery from all publicly available sources and reflected such information in Company's share price. Under these circumstances, all purchasers of Company's shares during the Class Period suffered similar injury through their purchase of Energy Recovery's shares at artificially inflated prices. Thus, a presumption of reliance applies.

65.     Accordingly, Plaintiff and Class members are entitled to a presumption of reliance upon the integrity of the market.

66.     In the alternative, Plaintiff and Class members are entitled to a presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 1456 (1972), because Defendants omitted material information during the Class Period violating a duty to disclose such information as described above.  Because this action involves

Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## LOSS CAUSATION

67.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

68.     During the Class Period, Plaintiffs and the Class purchased Energy Recovery's shares at artificially inflated prices and were damaged thereby. The price of Energy Recovery shares significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## NO SAFE HARBOR

69.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to the allegedly false statements and omissions pled in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and circumstances. To the extent certain of the statements alleged to be false and misleading may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made, and were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pled herein, Energy Recovery and the Individual Defendants are liable

for those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of Energy Recovery who knew that those statements were false and misleading when made.

## SCIENTER ALLEGATIONS

70.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Energy Recovery and Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding the Company, their control over, and/or receipt and/or modification of Company's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Energy Recovery, participated in the fraudulent scheme alleged herein.

71.     Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

72.     The Individual Defendants, because of their positions with Energy Recovery, made and/or controlled the contents of the Company's public statements during the Class Period. Each Defendants were provided with or had access to the information alleged herein to be false and/or

misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, these Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were materially false and misleading. As a result, each of these Defendants are responsible for the accuracy of Energy Recovery's corporate statements and are therefore responsible and liable for the representations contained therein.

73.     During the Class Period, the Company has experienced turmoil at its highest ranks. The Company's CEO and President, Defendant Gay left the Company in February 2018, citing to "personal family matters."  The Company then announced the elevation of its then CFO Defendant Gannon to position of interim President and CEO, then President and CEO in May 2018.  However, less than two years into his tenure, on November 1, 2019, the Company announced his resignation too, citing "personal reasons."  He has since then been replaced by Defendant Mao who was appointed as the interim CEO and formally elevated to the position in May 2020. Most recently, on March 19, 2020, the Company announced the immediate departure of Eric Siebert, Vice President of Oil & Gas, who was intimately involved in the development of the VorTeq technology since its launch.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### (Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder) Against All Defendants

74.     Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

75.     During the Class Period, Energy Recovery and the Individual Defendants individually and in concert, directly or indirectly, disseminated or approved false statements which they knew or deliberately disregarded in that they contained misrepresentations and failed to disclose material facts

to make the statements made not misleading.

76.     Energy Recovery and the Individual Defendants violated § 10(b) of the 1934 Act and Rule 10b-5 by: (a) making false statements of material facts or omitted to state material facts needed to make the statements not misleading; or (b) engaging in acts and practices that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with purchases of Company's shares during the Class Period.

77.     Energy Recovery and the Individual Defendants acted with scienter because they knew that the statements issued in the name of Energy Recovery were materially false and misleading; knew that these statements would be disseminated to investors; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of these statements as primary violations of securities laws. Energy Recovery and the Individual Defendants, through receipt of information reflecting true facts about Energy Recovery, their control over, and/or receipt of or modification to Company's allegedly materially misleading statements, which made them aware of Company's confidential proprietary information, participated in the fraudulent scheme complained of herein.

78.     The Individual Defendants had actual knowledge of material omissions and/or the falseness of material statements set forth by Energy Recovery, and intended to deceive Plaintiff and Class members, or at a minimum, recklessly disregarded the truth through their failure to ascertain and disclose the truth in statements made by them or other Energy Recovery employees to investors, including Plaintiff and Class members.

79.     Pursuant to the foregoing, the price of Energy Recovery shares were artificially inflated during the Class Period. Due to their lack of knowledge of the false nature of statements made by Energy Recovery and the Individual Defendants, Plaintiff and Class members relied on the statements made by Defendants and/or the integrity of the market price of Energy Recovery's shares during the Class Period in purchasing the Company's shares at prices that were artificially inflated due to false

and misleading statements made by Energy Recovery and the Individual Defendants.

80. Were Plaintiff and Class members made aware that the market price of Energy Recovery shares were artificially and falsely inflated by misleading statements made by Energy Recovery and the Individual Defendants, and by material adverse information that Energy Recovery and the Individual Defendants failed to disclose, they would not have purchased Energy Recovery's shares at artificially inflated prices, or purchased them at any price.

81. Based on the wrongful conducted alleged herein, Plaintiff and Class members have suffered damages in an amount to be determined at trial.

82. Energy Recovery and the Individual Defendants violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiff and Class members for significant damages suffered via their purchases of Energy Recovery's shares during the Class Period.

### SECOND CLAIM FOR RELIEF

**(Violation of Section 20(a) of the Exchange Act)**
**Against the Individual Defendant**

83. Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

84. During the Class Period, the Individual Defendants were involved in the management and operation of Energy Recovery's business affairs. Due to their senior positions, they had knowledge of adverse non-public information regarding Energy Recovery's development of VorTeq and the relationship with Schlumberger and impending commercialization and false representations in connection therewith.

85. As highly positioned officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information regarding Energy Recovery's progress on VorTeq's commercialization, financial condition and results of operations, and to correct any public statements issued by Energy Recovery which were materially false or misleading.

23

86. Due to their position of authority at Energy Recovery, the Individual Defendants controlled the contents of various public filings, press releases and reports which Energy Recovery disseminated in the market during the Class Period. During the Class Period, the Individual Defendants utilized his authority to cause Energy Recovery to execute the wrongful acts alleged herein. The Individual Defendants were therefore a "controlling person" at Energy Recovery pursuant to Section 20(a) of the Exchange Act. On this basis, they were a participant in the unlawful conduct alleged which caused the prices of Energy Recovery shares to be artificially inflated.

87. Based on the conduct described above, the Individual Defendants are liable for the violations committed by Energy Recovery pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully demands relief as follows:

A. Certifying this lawsuit as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiff as Class Representative;

B. Awarding damages in favor of Plaintiff and members of the Class against Energy Recovery and the Individual Defendants, jointly and severally, for all damages sustained as a result of Energy Recovery's wrongdoing, in an amount to be proven at trial;

C. Awarding Plaintiff and members of the Class their costs of suit, including reasonable attorneys' fees and expenses, and including expert fees, as provided by law;

D. Awarding Plaintiff and members of the Class pre- and post-judgment interest at the maximum rate allowable by law; and

E. Directing such further relief as it may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

Dated July 21, 2020

**LOWEY DANNENBERG, P.C.**

*/s/ Christian Levis*
Christian Levis
Andrea Farah
44 South Broadway, Suite 1100
White Plains, New York 10601
Telephone: 914-997-0500
Email:  clevis@lowey.com
         afarah@lowey.com

*Counsel for Plaintiff*

SWORN CERTIFICATION OF PLAINTIFF
PURSUANT TO THE FEDERAL SECURITIES LAWS

I, Frank Visser certify that:

1. I have reviewed the Complaint and authorize its filing and/or the filing of a Lead Plaintiff motion on my behalf.

2. I am duly authorized to institute legal action against Energy Recovery Inc. and other defendants.

3. I did not purchase Energy Recovery Inc. securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

4. I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

5. My transactions in Energy Recovery Inc's securities during the Class Period are set forth below.

6. I have not sought to serve, nor served, as a representative party on behalf of a class under this title during the last three years.

7. I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.


July ,2020    /5
Date

Frank Visser